Mrs. Essie RAHN, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 1310.

United States District Court
S. D. Georgia,
Savannah Division.

Feb. 11, 1963.

---

Joseph B. Bergen, Savannah, Ga., for plaintiff.

Richard C. Chadwick, Asst. U. S. Atty., Savannah, Ga., for defendant.

SCARLETT, District Judge.

### Statement of the Case

This is a case based on a complaint filed by the plaintiff alleging that the defend-

ant, the UNITED STATES OF AMERICA, permanently injured her as the result of the malpractice of government physicians during the treatment of a broken arm she sustained on March 20, 1959. It was undisputed that the plaintiff was entitled to treatment at the United States Air Force Hospital, at Hunter Air Force Base, Savannah, Georgia, as a military dependant. The plaintiff filed her action on November 24, 1961, alleging that she sustained a fracture of both bones in her right arm at the wrist on the foregoing date and she was treated for this injury at Hunter Air Force Base Hospital. She alleged that by reason of her not being able to receive her hospital records from the government until July 18, 1961, after they had been retired to the Military Personal Records Center at St. Louis, Missouri, for storage, she was not able to learn that the government's agents negligently reduced and set her fractures and improperly cared for her arm and that this accounted for the fracture of one of the bones in her arm not being united and the fracture of the other bone being improperly united with a ten degree tilt thereby causing deformities.

The government moved to dismiss the plaintiff's complaint on the ground that it wasn't filed within the two year Statute of Limitations. This motion was denied in view of the allegation that the delay was caused by the government concealing facts upon which the plaintiff's claim arose.

The issues were tried before this Court on January 31, 1963, following a detailed statement by counsel for the plaintiff as to what the plaintiff expected to prove. The government made no statement as to its defense; such statement being waived by announcement from government counsel. The plaintiff thereupon proceeded by testifying that she was admitted to the emergency room of Hunter Air Force Base Hospital at approximately noon on March 20, 1959, and her arm was x-rayed. She was told by the attending physician after examination, that due to the swelling in her arm, it could not be reduced or set at that time. She was given some pain pills and told to go home and keep her arm packed in ice and return three days later, the following Monday. The plaintiff testified that she returned as directed and there was another unsuccessful attempt to reduce her fractured arm, even though local anesthetic was used. She was sent home again with the same instructions and told to return the next day, Tuesday, for admittance. That Tuesday afternoon the plaintiff was admitted to the Hospital and on the next morning, Wednesday, she was placed under a general anesthetic and a cast applied. The next day, Thursday, March 26th, the plaintiff was discharged from the hospital and thereafter returned for treatment as an out-patient, as instructed, two weeks later. The plaintiff testified that she returned as instructed on every occasion thereafter. She testified that when the cast was removed a number of weeks after her arm had been set under general anesthetic, she noticed a protrusion at the wrist and that she was unable to use her hand, and upon making inquiry about the condition of her hand and wrist, she was told that her condition would clear up with exercise after the smaller cast which was then placed on her arm was removed. When the smaller cast was removed, the doctor in charge of the plaintiff's case told her that the arm was well-healed and that she was progressing satisfactorily; that all she needed was physiotherapy and exercise and everything would be all right in time. The plaintiff reported for therapy treatment at all times scheduled and she was subsequently discharged on September 15, 1959.

The plaintiff said she had no knowledge what caused her injuries until July 18, 1961, as she relied upon the assurances given her by the government doctors that her arm was well-healed and would be all right in time, and consequently, she had no reason to think that her arm had been improperly treated until her attorney received the original medical records which showed to the contrary. In fact, the plaintiff stated that she had no idea

of bringing an action, or that she even had an action against the government until after receiving these records which were obtained for the sole purpose of proving a claim that she had filed against the parties responsible for her arm being broken in the first place, and that was the reason that she requested the records center to send these records to her. The plaintiff testified that she is still unable to use her hand or rotate her wrist, and that she is suffering pains in her hand and arm continuously, with these pains radiating up into and throughout her shoulder from time to time. She testified that she was unable to perform her normal duties as a landlady of several boarding houses, which includes cleaning and making beds. The plaintiff also testified that she felt that the sum of Seventy-five Thousand ($75,000.00) Dollars would reasonably compensate her for her pain and suffering as the result of her arm being improperly set and for the permanent loss of use and disfigurement of her arm and hand.

Next, plaintiff introduced a series of letters from her attorney to the Commanding Officer of the Hunter Air Force Base Hospital repeatedly requesting the original medical reports on the plaintiff and the official narrative summary of treatment rendered by the attending physician of plaintiff. These letters were introduced without objection from the government. Then the plaintiff introduced a series of letters from the Commanding Officer Hunter Air Force Base Hospital replying to her counsel's inquiries and requests, which stated that plaintiff's arm was well-healed. None of these letters indicated that there had been any difficulty in the treatment of plaintiff's arm other than stating that plaintiff was supposed to be receiving physiotherapy treatment but that she had not been keeping her appointments. They did not reply to the numerous requests for the original hospital records.

The plaintiff then put a local registered photographer on the stand who testified that he had been employed by plaintiff's counsel to take pictures of her arm while in the hospital at Hunter Air Force Base but the hospital denied him this privilege when he attempted to do so, although he testified that he had, through the years, taken many, many pictures of other patients at this installation with the consent of the hospital authorities, and this was the first time he has ever been refused.

The plaintiff continued by introducing without objection the original hospital records which were finally received from the Records Center in St. Louis, Missouri, by plaintiff's counsel on July 18, 1961, as an enclosure to a letter dated July 17, 1961. These records reflect that the government doctors were unable to properly align the bones in plaintiff's arm at the time she was placed under general anesthetic and that they knew this from x-rays taken at the time. The records further showed that when the plaintiff returned three weeks after she had broken her arm, x-rays showed her arm was still inadequately reduced resulting in an upward tilting of the distal fragment, and these records contained the notation that it was too late to reduce her arm. Two weeks later the records show that there still was a completely inadequate result, with the notation that much future arthritic changes and symptoms could be expected. Two weeks after that a small cast subsequently placed on plaintiff's arm was removed, and the notations on the original records showed that she had a definite limitation to motion in all directions. One month later the original records showed that the plaintiff's arm was in poor alignment and that she still had no power in her wrist. The records showed that she had been given physiotherapy treatments and the last treatment was on September 15, 1961, with the notation that that was to be the last treatment. The records showed that the plaintiff appeared for all of her treatments, including the last treatment, and that she was to be seen as need be.

Finally, the plaintiff placed an orthopedic specialist on the stand, whose qualifications as an expert in the field of orthopedics were admitted by the government,

and this doctor testified that the plaintiff's arm was permanently disabled and that she would have permanent pain, disability, and disfigurement in her arm, as alleged, and as testified to by plaintiff. This doctor testified that he had x-rayed and examined plaintiff's arm and in his opinion ordinary good medical practice in caring for the plaintiff's arm required that the doctor who attempted to set her fracture, who was not an orthopedic specialist, should have called in an orthopedic specialist, who was then reasonably available, for consultation and assistance. This testimony, he stated, was based on his findings and the examination of the original records showing the difficulty which the attending physician incurred in trying to set plaintiff's arm and the admitted poor results by this physician, which he further stated, caused her present pain, disability and deformity. The orthopedic doctor concluded by saying, in his opinion, the plaintiff's pain, disability and deformity would remain with her for the rest of her natural life.

The plaintiff whereupon rested her case and government counsel announced that the government would not present witnesses in its behalf, and did not desire to make argument. The plaintiff's counsel then announced that, under the circumstances, he would make no argument, since his opening statement and the evidence presented fully presented the plaintiff's case. Then the Court called for a memorandum brief on the question of malpractice to be submitted in letter form within ten days.

NOW WHEREAS this cause came on regularly for trial, as stated, and the court has duly considered the evidence and has been fully apprised in the premises, the following findings are made:

### Findings of Fact

This court finds that on the 20th day of March, 1959, the defendant, through its agents at Hunter Air Force Base Hospital, undertook to treat the plaintiff's broken arm and to care for her arm until well, which was treatment and care to which plaintiff was entitled from the defendant as a military dependant, and

after attempting to set the plaintiff's broken arm, on March 20th, and again on March 23rd, without having admitted the plaintiff to the hospital, a final attempt was made to set the plaintiff's arm on March 25th, after admitting the plaintiff to the hospital, and a cast was applied to her broken arm, when the defendant's agents knew that plaintiff's arm had not been properly set and was not in proper alignment.

It is the finding of this court that the defendant and its agents knew that the plaintiff's arm was not properly set and aligned during the period of time the defendant's agents informed plaintiff that her arm was well-healed and progressing satisfactorily, and at no time did the defendant or its agents ever inform plaintiff that her arm was not properly aligned as stated on the medical records which the plaintiff repeatedly requested from the defendant's agents, but which requests were denied.

The court also finds that the plaintiff's right hand is permanently totally disabled and permanently disfigured and that plaintiff has continuously endured substantial pain in her arm from the time she was discharged from treatment by the defendant until the time that the issues were tried in this case, and that she will continue to endure this pain for the remainder of her natural life.

The court further finds that the plaintiff followed all instructions given her by the defendant's agents and submitted herself to all treatments prescribed, and co-operated with defendant's agents to the fullest extent in an effort to cure her injury.

It is the finding of this court that the plaintiff had no knowledge or reason to suspect that the agents of the defendant did not properly care for her injury until July 18, 1961, as the agents of the government treating the plaintiff withheld the medical records on the plaintiff reflecting the fact that her arm had not been properly set all during the course of treatment, but to the contrary, the agents of the defendants told the plaintiff that her arm was well-healed and progressing

satisfactorily on the occasion of each of her treatments and through correspondence.

■ This court finds that the agents of the defendant did not exercise a reasonable degree of care in their treatment of plaintiff, as ordinarily employed in good medical practice generally under similar circumstances, and that the government agents misled the plaintiff by affirmatively assuring her and caused her to think that her arm was well-healed and progressing satisfactorily, when these agents knew that the plaintiff's arm was not properly set and aligned, and they did not act in good faith towards the plaintiff. The agents of the defendant knew that orthopedic specialists were available to assist in the treatment of plaintiff's arm, but they failed to seek assistance from such specialist and to advise the plaintiff of such facts.

The foregoing acts of the agents of the government were the proximate cause of the present condition of plaintiff's arm, and as the result thereof, and by reason of the premises herein, the plaintiff is entitled to damages from the defendant for all past, present, and future pain and suffering, and physical disability and deformity in the total amount of $7,500.-00.

### Conclusions of the Law

■ From the foregoing facts the court concludes as a matter of law that the agents of the defendant who treated plaintiff were required to exercise a reasonable degree of care in such treatment, and their failure to exercise such care, which resulted in the plaintiff's injury, was a tort for which recovery may be had. See: Ga.Code § 84–924, and Richards v. Harpe, 42 Ga.App. 123, 123(11), 155 S.E. 85. The standard of care that must be exercised is that which is ordinarily employed by the profession generally. Kuttner v. Swanson, 59 Ga.App. 818, 819(1), 2 S.E.2d 230. The agents of the government having failed to exercise this care which other members of the medical profession in good standing would ordinarily exercise under similar circumstances

made the defendant liable for her injuries. Howell et al. v. Jackson, 65 Ga.App. 422(3), 16 S.E.2d 45. The plaintiff had a right to rely upon the defendant for her treatment without her calling others in to determine whether the defendant's agent were properly treating her, and she was not bound to consult other doctors unless she was fully aware that the defendant's agents were not properly treating her injury. See discussion in: 54 A.L.R.2d, at page 226.

■ This court also concludes as a matter of law that it was the duty of physician treating plaintiff to act with the utmost good faith toward his patient, and since he knew that he could not accomplish a cure, or that the treatment adopted would probably be of no benefit, it was his duty to advise his patient of these facts, and since he failed to do so, he was guilty of a breach of duty. See discussion in: 70 C.J.S. Physicians and Surgeons, § 48m. Also see: Tvedt v. Haugen, 70 N.D. 338, 294 N.W. 183, 132 A.L.R. 379, 397, which states, "If the physician knows that there is another mode of treatment that is more likely to be successful, which he does not have the facilities or the training to give, but which is available from specialists, it is his duty to advise his patient of these facts." If the physician misleads a patient by not only failing to give him this information but affirmatively assures him of a cure, the physician is liable for the harmful consequences, such as suffered by the plaintiff here. In addition, " * * * where the result of the medical treatment is so pronounced as to become apparent as where a leg or limb has been broken is shorter than the other after such treatment * * * this fact may be testified to by anyone competent to testify; * * * " including the plaintiff here. Summerour v. Lee, 104 Ga.App. 73, 75, 121 S.E.2d 80, 81.

"Where a party has evidence in his power and within his reach, by which he may repel the claim or charge against him, and omits to produce it, * * * a presumption arises that the charge or claim is well founded." See: Cotton

States Fertilizer Co. v. Childs et. al., 179 Ga. 23, 174 S.E. 708.

 The court further finds, as a matter of law, that the Statute of Limitations does not commence to run until an injured party, such as the plaintiff, obtained knowledge of the wrongful actions committed against her and which had been concealed to a time which was within two years of the date suit was filed. The Statute of Limitations is tolled where a physician has concealed the facts showing negligence, and the Statute of Limitations begins to run only when the facts are discovered. See discussion in: 41 Am.Jur.Sec. 123, and the Annotations in: 74 A.L.R. 1320 and 1321.

"Claim under Federal Tort Claims Act of civilian army employee, who was entitled to medical treatment, for faulty medical advice at the time of medical examination and x-rays on or about March 10, 1949, allegedly preventing further test and treatment for insipid tuberculosis, did not accrue until advanced tubercular condition manifested itself before an examination and x-rays which were made in February, 1950 disclosed that civilian employee had advanced tuberculosis, and suit which was filed on November 29, 1951, was within two years statute of limitations." United States v. Reid, 251 F.2d 691 (Fifth Circuit Court of Appeals).

Also see: Crummer Co. v. Du Pont, 255 F.2d 425, (Fifth Circuit Court of Appeals) certiorari denied, 358 U.S. 884, 79 S.Ct. 119, 3 L.Ed.2d 113. "Statute of Limitations does not in all events commence to run from date when injured party learns that two or more persons had injured him if he does not until later learn that their actions, * * * amounted to conspiracy between them all."

 A concealment of a cause of action from one in whom it resides, by one against whom it lies constitutes an exception to the Statute of Limitations, postponing the commencement of the running of the Statute until discovery of the fact by the owner of the cause of action; and under this rule one who wrongfully conceals material facts and thereby prevents discovery of his wrong or the fact that the cause of action was accrued against him is not permitted to assert the Statute of Limitations as a bar to an action against him, thus taking advantage of his own wrong. See: Traer v. Clews, 115 U.S. 528, 6 S.Ct. 155, 29 L.Ed. 467, 469.

Stated in another way, the rule is that where a party against whom a cause of action has accrued in favor of another, but concealment prevents other party from obtaining knowledge thereof, the Statute of Limitations would begin to run from the time the right of action is discovered. See: Rosenthal v. Walker, 111 U.S. 185, 4 S.Ct. 382, 28 L.Ed. 395.

Let judgment be entered accordingly.