Rocco FRIDONO, Appellant–Plaintiff,

v.

Charles M. CHUMAN, M.D.,
Appellee–Defendant.

No. 45A04–0002–CV–61.

Court of Appeals of Indiana.

May 3, 2001.

Priscilla A. Herochik, Merillville, IN, Attorney for Appellant.

Michael E. O'Neill, Louis W. Voelker, Eichhorn & Eichhorn, Hammond, IN, Attorneys for Appellee.

## OPINION

BROOK, Judge.

### Case Summary

Appellant-plaintiff Rocco Fridono ("Fridono") appeals the jury verdict on his medical malpractice claim in favor of appellee-

defendant Charles M. Chuman, M.D. ("Chuman"). We affirm.[1]

## Issues

Fridono presents three issues for our review, which we consolidate and restate as follows:

I. whether a document identifying the restrictions placed on the staff privileges of Fridono's expert witness was privileged under the peer review statutes and therefore inadmissible for purposes of impeachment on cross-examination; and

II. whether the trial court erred in refusing to give Fridono's tendered jury instruction.

## Facts and Procedural History

### Medical History

This case arises out of a cervical laminectomy[2] performed by Chuman on Fridono on April 19, 1989. Fridono first injured his back in 1977. In 1979, Fridono experienced pain in his neck and upper extremities; he was treated by a chiropractor at that time. However, the pain worsened, and Fridono sought further treatment.

Fridono first visited Chuman in October 1985. Fridono had seen several physicians prior to meeting with Chuman. After reviewing the radiology films from several studies of Fridono's lumbar and cervical spine, Chuman diagnosed Fridono with polyradiculopathy, but did not consider him a surgical candidate at that time. Chuman recommended conservative treatment, including injections of cortisone and anesthetic. He also recommended a CT[3] scan of the neck and lower back. Fridono received the injections but did not follow up on the radiological studies.

Fridono did not return to Chuman until August 1986. Meanwhile, Fridono consulted two other physicians about his lower back pain. One of the physicians recommended urological and psychological evaluations. In August 1986, at his second visit to Chuman, Fridono complained of pain and numbness in his legs, buttocks, and groin; burning in the pelvic area, lower bowel, and rectum; and pain in both arms. Chuman believed Fridono had stenosis[4] of the spinal canal and recommended a myelogram[5] to evaluate the problem.

In July 1987, Fridono consulted a psychiatrist who noted that Fridono's condition was probably prepsychotic, but that the physical evaluations would validate the organic nature of his back difficulties. Another psychiatrist concluded that Fridono suffered from depression, anxiety disorder, and multiple physical problems, but that he was competent to handle his affairs.

Fridono returned to Chuman on August 27, 1987, with the films from a myelogram. Fridono was experiencing the same problems as he had a year earlier, and Chuman concluded that he was "getting to be a surgical patient." Chuman recommended traction treatment, a form of

---

1. We heard oral argument in this cause on April 16, 2001, in Indianapolis. We commend both parties for the quality of their preparation and presentations.

2. Cervical is defined as "relating to a neck or cervix, in any sense." THOMAS L. STEDMAN, STEDMAN'S MEDICAL DICTIONARY 280 (25th ed.1990). A laminectomy is the "excision of a vertebral lamina; commonly used to denote removal of the posterior arch." *Id.* at 839.

3. "CT imaging involves taking x-rays from many different angles, feeding the image data into a computer, and generating a high resolution composite image from the computer." 2 DAN J. TENNENHOUSE, ATTORNEYS MEDICAL DESKBOOK 3D § 14:1 (1993).

4. Stenosis is defined as "a stricture of any canal." STEDMAN, *supra* note 1, at 1473.

5. A myelogram is an x-ray "study of the spinal cord." *Id.* at 1013.

physical therapy, for Fridono's cervical spine and referred Fridono to Dr. Shepherd ("Shepherd"), an orthopedic surgeon, for evaluation of his lumbar spine. Shepherd concluded that Fridono would most likely need a laminectomy and foraminotomy[6] in the lumbar spine with possible fusion. In December 1987, Fridono saw Dr. Rajan Raj ("Raj"), a neurosurgeon, who recommended another myelogram. In March 1988, Raj performed an anterior cervical discectomy[7] and fusion; he also referred Fridono to a pain clinic.

Fridono returned to Chuman in August 1988 with complaints of numbness in his hands and burning in his groin, genitals, and buttocks. Fridono indicated to Chuman that the cervical traction provided only temporary relief and that Raj had referred him to a pain clinic. Chuman planned to send Fridono to Shepherd for lumbar fusion surgery and to reevaluate the fusion three months later. In September 1988, Fridono returned to Chuman complaining of severe cervical pain and spasms in the shoulder as well as lower back, groin, and leg pain. Chuman believed Fridono had spinal cord compression. Chuman did not refer Fridono for physical therapy or pain clinic treatment, as Fridono had already received those treatments without relief.

Fridono continued to complain of pain in November 1988. At that time, Fridono underwent an MRI[8] and a CT scan, which revealed degenerative changes in his lower back. On November 10, 1988, Chuman concluded that Fridono had spinal stenosis, but an MRI of the cervical spine did not reveal definitive evidence of either stenosis or cord compression. On Novem-

ber 28, 1988, Chuman referred Fridono to Dr. Larry Salberg ("Salberg"), director of the Northern Indiana Neurological Institute, for a neurological evaluation. Salberg urged that Fridono not undergo any surgical procedures until neurological and neuropsychological evaluations could be completed. Salberg indicated that he "strongly disapprove[d] of any further surgery being performed ..., until total evaluation [could] take place, and possibly even a trial of medical, psychological, and physical therapy, therapies [could] be tried in a multidisciplinary approach." In December 1988, Fridono underwent decompression laminectomy and discectomy performed by Dr. Gerald Kane, an orthopedic surgeon. Two months later, Fridono saw Dr. Ronald Pawl ("Pawl"), a neurosurgeon. Fridono indicated to Pawl that he did not want to consider a pain treatment clinic at that time.

On March 9, 1989, Fridono returned to Chuman. Chuman evaluated Fridono's complaints and recommended another MRI, which was performed on March 27, 1989. Chuman tried to refer Fridono to Salberg, but Fridono declined. Chuman admitted Fridono for surgery in April 1989. He explained the medical findings of the tests indicating the reasons for doing the laminectomy, treatment alternatives to surgery, and the risks of surgery. Before performing the surgery, Chuman sought a psychiatric consult because Fridono had been verbally abusive to nursing staff at the hospital. Chuman performed the laminectomy on April 19, 1989.

### Procedural History

Fridono initiated this medical malpractice action by filing a proposed complaint

---

**6.** A foraminotomy is "[a]n operation upon an aperture, usually to open it, *e.g.*, surgical enlargement of intervertebral foramen." *Id.* at 607.

**7.** A discectomy is an "excision, in part or whole, of an intervertebral disk." *Id.* at 442–43.

**8.** MRI is the abbreviation for "magnetic resonance imaging." *Id.* at 985.

with the Indiana Department of Insurance in 1991. On May 5, 1993, two physicians on the medical review panel determined that Chuman breached the standard of care in his treatment of Fridono, while the third physician indicated that Chuman did not breach the standard of care. The three members unanimously agreed, however, that the medical care given by Chuman was not the proximate cause of any damages suffered by Fridono. In October 1993, after the medical panel review process, Fridono filed his complaint in the Lake Circuit Court. Fridono alleged that Chuman failed to comply with the applicable standards of care in performing the laminectomy. A jury trial commenced in November 1999.

At trial, Fridono presented the testimony of Dr. William Fischer ("Fischer") in support of his theory that the surgery performed by Chuman was unnecessary. Fischer's testimony was presented by a videotaped deposition. In qualifying Fischer as an expert witness, Fridono questioned Fischer about his qualifications and credentials at Northwestern University Medical School ("Northwestern"). On cross-examination, Chuman asked Fischer if his staff privileges at Northwestern had ever been restricted or modified. Fischer denied that his privileges had been restricted. At that point, Chuman presented

a letter agreement between Fischer and Northwestern that imposed restrictions on his privileges as a result of a peer review process. References to the peer review committee and process were redacted, but not the specific restrictions placed on Fischer. Chuman had obtained the agreement through discovery in other judicial proceedings in Illinois. Chuman used the document to impeach Fischer and challenge his qualifications as an expert. Fridono objected to the use of the document, claiming that it was privileged under the peer review statutes. At trial, Fridono sought a motion in limine to preclude Chuman from using the document and to redact the testimony given by Fischer at the deposition relating to the document. The trial court denied the motion. The jury returned its verdict in favor of Chuman on November 12, 1999.

### Discussion and Decision

#### I. Peer Review Privilege

Fridono contends that the trial court erred in permitting Chuman to use a letter agreement to impeach Fischer. Specifically, Fridono argues that the letter agreement was part of a peer review process and was therefore inadmissible under both Indiana and Illinois law.[9] Chuman responds that the letter agreement was related to a peer review process,[10] but that

9. Fridono also contends that the letter agreement did not address "final action" under the Indiana peer review statute because it indicated a *continuing* evaluation of Fischer's privileges. Following Fridono's argument to its logical conclusion, only the termination of privileges would qualify as final action, and therefore, no restrictions or modifications of a physician's privileges would ever be disclosed. Therefore, we summarily reject Fridono's argument.

Fridono also argues that the letter agreement was specifically identified as peer review material and was labeled confidential and privileged pursuant to the Illinois Medi-

cal Studies Act. Fridono's argument is without merit. "Hospital may not insulate itself from judicial review simply by stamping the words 'Privileged Peer Review Material' on its files." *Ray v. St. John's Health Care Corp.*, 582 N.E.2d 464, 474 (Ind.Ct.App.1991) (noting that "the trial court had a duty to dig behind the labels Hospital put on its documents"), *trans. denied.*

10. Indiana Code Section 34-6-2-99(a) provides,

"Peer review committee," for purposes of IC 34-30-15, means a committee that:
(1) has the responsibility of evaluation of:

the letter agreement and its use were limited to the result of the peer review process, namely, the restrictions placed on Fischer. Thus, Chuman argues, the document was admissible as impeachment evidence under both Illinois and Indiana law.

### A. Standard of Review

■ "[R]eviewing courts give great deference to the evidentiary decisions of the trial court. We review only for an abuse of discretion and reverse only when the decision is clearly against the logic and effect of the facts and circumstances." *Ledbetter v. Ball Mem'l Hosp.*, 724 N.E.2d 1113, 1117 (Ind.Ct.App.2000), *trans. denied.*

■ Initially, we note that the parties analyze the peer review privilege under both Indiana and Illinois law. The letter agreement in question was created pursuant to a peer review committee proceeding in Illinois and under the Illinois Medical Studies Act. *See* 735 ILL. COMP. STAT. 5/8–2101 to –2105. Therefore, we must determine which law applies. "If the purposes and policies of two potential rules are the same, the forum should apply the forum law." *Hartford Acc. & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 291 (Ind.Ct. App. 1997), *trans. denied* (1998). Here, the purpose and policy of both the Indiana and Illinois peer review privileges are the same: to foster an effective review of medical care by permitting the members of the peer review panel to communicate "candidly, objectively, and conscientiously." *Terre Haute Reg'l Hosp., Inc. v. Basden*, 524 N.E.2d 1306, 1311 (Ind.Ct.App. 1988); *see Knapp v. Palos Cmty. Hosp.*,

176 Ill.App.3d 1012, 126 Ill.Dec. 362, 531 N.E.2d 989, 995 (1988) (stating that the purpose of the peer review privilege "is to ensure the effectiveness of professional self-evaluation, by members of the medical profession, in the interest of improving the quality of health care" by allowing candid discussion by the peer review committee (internal quotations omitted)), *cert. denied*, 493 U.S. 847, 110 S.Ct. 141, 107 L.Ed.2d 100 (1989). Thus, we apply Indiana law.

### B. Indiana Peer Review Statute

Indiana Code Section 34–30–15–1 provides:

(a) All proceedings of a peer review committee are confidential.

(b) All communications to a peer review committee shall be privileged communications.

(c) Neither the personnel of a peer review committee nor any participant in a committee proceeding shall reveal any content of:

(1) communication to;

(2) the record of; or

(3) the determination of;

a peer review committee outside of the peer review committee.

**(d) However, the governing board of:**

**(1) a hospital;**

. . .

**may disclose the *final action taken* with regard to a professional health care provider without violating the provisions of this section.**

(A) qualifications of professional health care providers;
(B) patient care rendered by professional health care providers; or
(C) the merits of a complaint against a professional health care provider that includes a determination or recommendation

concerning the complaint, and the complaint is based on the competence or professional conduct of an individual health care provider, whose competence or conduct affects or could affect adversely the health or welfare of a patient or patients. . . .

(Emphases added). This section provides that the final action (i.e., the restrictions placed on a physician's privileges as a result of peer review proceedings) may be disclosed without violating the confidentiality provisions of the statute.

However, Indiana Code Section 34–30–15–9 provides:

> Except in cases of required disclosure to the professional health care provider under investigation, no records or *determinations of* or communications to a peer review committee shall be:
>
> (1) subject to subpoena or discovery; or
>
> (2) admissible in evidence;
>
> in **any** judicial or administrative proceeding, including a proceeding under IC 34–18–11 [medical malpractice; preliminary determination of affirmative defense or issue of law or fact; discovery], without a prior waiver executed by the committee.

(Emphases added). This section provides that determinations of the peer review committee may not be discovered or admitted in a judicial proceeding absent written waiver. The two sections are in apparent conflict: one provides for disclosure of a final action taken by a hospital, yet the other prohibits the discovery or admission of the determinations of peer review committees in judicial proceedings absent a waiver. Thus, final actions, which could be included in determinations of peer review committees, could not be disclosed in judicial proceedings absent a waiver.

## C. Statutory Construction

The interpretation of a statute is a question of law reserved for the courts. *Pedraza ex rel. Pedraza v. Grande*, 712 N.E.2d 1007, 1010 (Ind.Ct. App.1999). "Our foremost objective in construing a statute is to determine and give effect to the intent of the legislature." *WorldCom Network Servs., Inc. v. Thompson*, 698 N.E.2d 1233, 1238 (Ind.Ct.App. 1998), *trans. denied*. "Where two statutes or two sets of statutes are apparently inconsistent in some respects and yet can be rationalized to give effect to both, it is this court's duty to do so." *Robinson v. Zeedyk*, 625 N.E.2d 1249, 1251 (Ind.Ct.App. 1993), *trans. denied* (1994). "It is only when there is an irreconcilable conflict that we will interpret the legislature to mean that one statute must give way to another." *Id.* "Statutes relating to the same general subject matter are in pari materia and should be construed together. Statutes are to be construed in connection and in harmony with the existing law and as part of a general and uniform system of jurisprudence." *Irving Materials, Inc. v. Board of Comm'rs of Johnson County*, 683 N.E.2d 260, 262 (Ind.Ct.App.1997), *trans. denied* (1998).

When a statute is ambiguous, we are "compelled to ascertain and execute legislative intent and to interpret the statute in such a manner as to prevent absurdity and difficulty and prefer public convenience." *Indiana State Teachers Ass'n v. Board of Sch. Comm'rs*, 693 N.E.2d 972, 974 (Ind.Ct.App.1998). "Where statutory provisions are in conflict, no part of a statute should be rendered meaningless but should be reconciled with the rest of the statute." *Robinson v. Wroblewski*, 704 N.E.2d 467, 474 (Ind.1998) (citations omitted). In construing a statute, we will presume that the legislators did not enact a useless provision. *Holmes v. ACandS, Inc.*, 709 N.E.2d 36, 39 (Ind.Ct.App.1999). " '[W]e presume that our legislature intended its language to be applied in a logical manner consistent with the statute's underlying policy and goals.' " *In re Estate of Inlow*, 735 N.E.2d 240, 251 (Ind. Ct.App.2000) (quoting *Citizens Action Co-*

*alition of Indiana, Inc. v. Indiana State-wide Ass'n of Rural Elec. Coops., Inc.,* 693 N.E.2d 1324, 1327 (Ind.Ct.App.1998)).

First, we must determine whether the apparent conflict between Indiana Code Section 34–30–15–1 and Section 34–30–15–9 can be reconciled. As discussed above, Section 34–30–15–9 prohibits the disclosure of determinations of a peer review committee in judicial proceedings absent a written waiver. Yet, Section 34–30–15–1 permits a hospital to disclose the final action taken as a result of peer review proceedings. Thus, we must determine whether the "determinations of" the peer review committee include or are synonymous with the "final action" taken.

█ When considered together, the statutes can be read to mean that a hospital board may disclose final action taken by a peer review committee, but that "final action" or "determination" may not be used in judicial proceedings. In other words, Section 34–30–15–9 can be viewed as a limitation on the disclosure exception in Section 34–30–15–1. However, we conclude that such a broad construction of the privilege is inconsistent with legislative intent.

█ As discussed *supra,* the purpose of the peer review privilege is to foster an effective review of medical care by permitting the members of the peer review panel to communicate "candidly, objectively, and conscientiously." *Terre Haute Reg'l Hosp., Inc.,* 524 N.E.2d at 1311. "[A] privilege should not be 'distorted by application in circumstances *where the policy behind the rule is not served.*' Mindful of this caveat, privileges should be applied only in a manner and in instances consistent with their purposes." *Ray v. St. John's Health Care Corp.,* 582 N.E.2d 464, 472 (Ind.Ct.App.1991) (quoting *Collins v. Bair,* 256 Ind. 230, 236, 268 N.E.2d 95, 98 (1971)), *trans. denied* (1992). We believe

that to read Section 34–30–15–9 as a *limitation* on the circumstances in which "final action" may be disclosed would place an unreasonable burden on litigants and could "unfairly impede the truth finding process" without furthering the purpose of the peer review privilege. *Id.* at 473. Consequently, we conclude that the "determinations of" a peer review committee are distinct from the "final action taken" by a hospital as a result of peer review proceedings.

█ Second, we must determine what is included within the "determinations of" the peer review committee and is therefore protected and what is outside the scope of the privilege. Given the purpose of the privilege, we conclude that the results of a peer review process are outside the scope of the privilege. Disclosure of the *results or consequences* of a proceeding (namely, the restrictions placed on a doctor's staff privileges) is not inconsistent with the purpose of the privilege: to encourage candor by the medical personnel on the committee. *See id.* In construing statutory provisions, we presume that the legislature did not enact a useless provision and therefore interpret the statute so as not to render any section meaningless. *See Robinson,* 704 N.E.2d at 474; *Holmes,* 709 N.E.2d at 39. To conclude that the "final action" taken as a result of peer review proceedings is synonymous with the "determinations of" the peer review committee would render meaningless the exception permitting disclosure of the final action. We conclude that "determinations of" a peer review committee include opinions and conclusions as to the performance of a physician's duties, recommendations as to the action to be taken as a result of those findings, and discussions among the peer review committee members in evaluating a physician's performance—essentially, opinions and discussions that occur within the peer review process itself and

not as a result of the process. Accordingly, the opinions of the committee members, their discussions, the documents created during deliberations, and the process itself are appropriately protected.

 In reaching the above conclusion, we have found Illinois law particularly instructive. Illinois law protects peer review proceedings including the documents, statements, opinions, evaluations, and reports of the peer review committee. *See* ILL. COMP. STAT. 5/8–2101, –2102. However, in determining the scope of the statutory privilege, Illinois courts have concluded that the results of peer review proceedings are not protected. *See Willing v. St. Joseph Hosp.*, 176 Ill.App.3d 737, 126 Ill.Dec. 197, 531 N.E.2d 824, 828 (1988) (concluding that interrogatories seeking the nature and extent of a physician's staff privileges and any restrictions imposed on the physician's privileges are appropriate because such information is not protected by the peer review privilege), *appeal denied* (1989). "[O]nly action[s] taken *during the peer-review process* are protected under the Act." *Id.* (emphasis added). As the Illinois Court of Appeals concluded in *Gleason v. St. Elizabeth Med. Ctr.*:

> While virtually every action of a doctor or hospital could, in some sense, arguably be connected to something that was said, done or recorded at a peer review session, *the statute evinces a legislative intent to shield the review process itself, and not actions later taken in consequence of that process.*

135 Ill.App.3d 92, 89 Ill.Dec. 937, 481 N.E.2d 780, 781 (1985) (holding that steps taken as a result of the peer-review process are outside the scope of the privilege) (emphasis added). Indeed,

> [t]he restrictions imposed by a hospital on a particular doctor's privileges to practice there may result from or be the consequence of the peer-review process, or of other internal methods of monitoring and reviewing hospital activity, but that does not mean that the restrictions themselves must also be considered privileged and kept . confidential. The reasons for according a privilege to the peer-review process simply do not apply to the restrictions that may be imposed as a result of that process.

*Richter v. Diamond*, 108 Ill.2d 265, 91 Ill.Dec. 621, 483 N.E.2d 1256, 1258 (1985) (concluding that disclosure of the nature and extent of restrictions imposed on physician's privileges over a period of time was not inconsistent with the purpose of the privilege and that therefore the information was discoverable and admissible).

Furthermore, several other states have permitted disclosure of the results of peer review proceedings. *See Bayfront Med. Ctr., Inc. v. Florida*, 741 So.2d 1226, 1229 (Fla.Dist.Ct.App.1999) ("[T]he report of the results of such 'peer review' investigations, as contrasted to the actual records of the investigative procedures of the 'peer review' panel, is not clothed with the same privilege."); CONN. GEN.STAT. ANN. § 19a–17b (West 2000) (providing that the proceedings of the peer review committee are not subject to discovery or admission in judicial proceedings; however, the provisions shall not preclude "in any civil action, disclosure of the fact that staff privileges were terminated, or restricted, including the specific restriction imposed, if any"); *Anderson v. Breda*, 103 Wash.2d 901, 700 P.2d 737, 741 (1985) ("Although the extent of a physician's hospital privileges may be determined by what occurs within a quality review committee, the fact that a physician's privileges are restricted, suspended or revoked is not properly subject to the protections of the statute. The goal and fundamental purpose of the statute is open discussion during committee investiga-

tions. Open discussion is not inhibited by permitting discovery of the effect of the committee proceedings."); *Moretti v. Lowe*, 592 A.2d 855 (R.I.1991) ("[T]he fact that privileges have been lost or restricted is highly relevant and material evidence in a medical-malpractice action that is not privileged.... Making the fact of loss or restriction of privileges unavailable to the injured party is not necessary to accomplish the purposes of the peer-review statute and therefore should not be privileged.").

To summarize, we conclude that given the purpose of the peer review privilege to promote candor and encourage physicians to engage in frank evaluation of their peers, the final action (modification, restriction, termination of privileges) taken as a result of peer review proceedings is outside the scope of the privilege and therefore is discoverable and admissible in judicial proceedings without the necessity of a written waiver by the peer review committee.[11] To protect such content from use in judicial proceedings does not serve the purpose of the peer review statute.[12] Rather, "[s]uch protection would expand the privilege beyond its intended scope and unfairly impede the truth finding process." *Ray*, 582 N.E.2d at 473. "[A] privilege should not be 'distorted by application in circumstances *where the policy behind the rule is not served.*' Mindful of this caveat, privileges should be applied only in a manner and in instances consistent with their purposes." *Id.* at 472 (quoting *Collins v. Bair*, 256 Ind. 230, 236, 268 N.E.2d 95, 98 (1971)). "[T]he purpose of privileges is not to suppress the truth." *Id.* at 473. Accordingly, the trial court did not err in admitting the letter agreement addressing the modification of Fischer's privileges.

## II. Jury Instruction

Fridono also contends that the trial court erred in refusing to give his ten-

---

11. Under both Indiana and Illinois law, the peer review privilege may only be waived by the peer review committee, and the privilege is not waived even though privileged communications and information may have been disclosed outside the peer review proceedings. *See Mulder v. Vankersen*, 637 N.E.2d 1335, 1339–40 (Ind.Ct.App.1994) ("The peer review privilege may only be waived by the execution of a waiver in writing.... Without a written waiver, a hospital does not waive the peer review privilege even though some of the communications may have been leaked outside the peer review proceedings. Therefore, a breach of confidentiality does not cause the peer review privilege to be waived.") (citation omitted), *trans. denied; see also* 735 ILL. COMP. STAT. 5/8–2102 ("Such information, records, reports, statements, notes, memoranda, or other data, shall not be admissible as evidence, nor discoverable in any action of any kind in any court or before any tribunal, board, agency or person. The *disclosure* of any such information or data, *whether proper, or improper, shall not waive or have any effect upon its confidentiality, nondiscoverability, or nonadmissibility.*" (emphases added)).

12. Moreover, we also recognize the impeachment value of such evidence on cross-examination. *See* Ind. Evid. Rule 607 ("The credibility of the witness may be attacked by any party, including the party calling the witness."); *Lenover v. State*, 550 N.E.2d 1328, 1331 (Ind.Ct.App.1990) ("The general rule regarding the admissibility of facts in connection with impeachment is that any fact which tends to reflect upon the veracity of the testimony may be introduced to impeach the witness."). "[W]henever expert testimony is admitted its opponent is free to challenge both the credibility of the expert and the weight to be given his testimony by the jury." *Ford Motor Co. v. Ammerman*, 705 N.E.2d 539, 550 (Ind.Ct.App.1999), *trans. denied.* We note that in certain circumstances the weight of such evidence may be limited given the remoteness of the impeaching evidence. *Cf.* Ind. Evid. R. 609 (providing ten-year limit on admission of evidence of prior conviction); *see Lenover*, 550 N.E.2d at 1331 ("Whether to permit cross-examination to test the credibility of a witness is within the trial court's discretion.").

dered jury instruction regarding a health care provider's duty to refer. Specifically, Fridono argues that Chuman was not qualified to treat pain clinic problems and that Chuman should have referred him to another physician for such treatment. Fridono asserts that absent the tendered instruction, the jury had no guidance in assessing the standard of care for the duty to refer. Further, Fridono asserts that the evidence at trial supported the instruction in that members of the medical review panel found that surgery was unnecessary, as did Salberg, who had examined Fridono and concluded that surgery should not be performed until a total evaluation had been completed.

 Chuman responds that the court's refusal of the instruction was appropriate because the instruction was not supported by the evidence and was adequately covered by other instructions. Specifically, Chuman argues that he was qualified to treat neurological problems. Fridono suffered from a condition falling within Chuman's specialty. Accordingly, Chuman contends that he did not have a duty to refer Fridono to another physician. Further, Chuman argues that Fridono had already received the treatments he claims were required before Chuman performed surgery.

The giving of jury instructions is a duty entrusted to the discretion of the trial court, and its decision will not be disturbed unless there is an abuse of that discretion. A party is generally entitled to have a tendered instruction read to the jury. On review, we will reverse the trial court's refusal to give a tendered instruction when: 1) the instruction is a correct statement of law; 2) it is supported by the evidence; 3) it does not repeat material adequately covered by other instructions; and 4) the substantial rights of the tendering party

would be prejudiced by the failure to give the instruction.

*Dughaish ex rel. Dughaish v. Cobb,* 729 N.E.2d 159, 163 (Ind.Ct.App.2000) (citations omitted), *trans. denied* (2001).

Fridono tendered the following instruction, which was refused by the trial court:

When a neurosurgeon is not qualified to treat a patient by reason of limitation of practice, lack of training in a certain specialty or lack of necessary facilities, the neurosurgeon has the duty to advise the patient to consult a specialist or one qualified in a method of treatment that the neurosurgeon is not qualified to give.

 We agree with Chuman that the tendered instruction is not supported by the facts of this case. Fridono does not challenge Chuman's qualifications as a neurosurgeon or his ability to perform the surgery. Rather, Fridono argues that Chuman violated the applicable standard of care by not referring him for alternative treatments. Essentially, Fridono contends that Chuman's choice of surgery rather than another treatment option violated the standard of care. Because Fridono's condition fell within Chuman's specialty, Chuman did not have a duty to refer Fridono to another specialist. The facts presented in the case before us are unlike those in cases where a general practitioner is presented with a problem beyond his or her expertise or a specialist is presented with an illness outside of his or her specialty and fails to refer the patient to a qualified physician. *See Rahn v. United States,* 222 F.Supp. 775, 780 (S.D.Ga.1963) (concluding that attending physician who treated patient with broken arm had a duty to refer patient to an orthopedic specialist; physician, who was not an orthopedic specialist, committed malpractice when he set patient's arm, knowing he was unable to do so properly, rather than referring patient to a qualified specialist); *but cf. Kranda*

v. *Houser–Norborg Med. Corp.*, 419 N.E.2d 1024, 1043 (Ind.Ct.App.1981) (concluding that evidence did not support instruction on duty to refer where no expert testified that gynecologist should have referred patient to another doctor; gynecologist treated a patient with Crohn's disease, which is generally treated by an internist or gastroenterologist, without consulting a specialist). Here, Chuman was presented with a problem within his specialty, and he treated the problem based on recognized methods within the specialty.

■ Furthermore, assuming *arguendo* that Chuman had an obligation to refer Fridono for other treatment, the record reveals that Chuman did exactly that on several occasions from 1985 to 1988. However, the attempts at conservative treatment failed, and Chuman determined that surgery was appropriate in 1989. Thus, any error in refusing the instruction is harmless. *See City of Indianapolis Hous. Auth. v. Pippin*, 726 N.E.2d 341, 349 (Ind. Ct.App.2000) ("Nonetheless, instructional errors which do not prejudice the substantial rights of the defendant do not require reversal.").

■ Fridono argues that although Chuman was a qualified neurosurgeon, he was not qualified to provide the *method* of treatment necessary and that Chuman should have referred him to specialists who could provide treatment methods other than surgery. Physicians are not required to use any particular method of treatment. *See Kranda*, 419 N.E.2d at 1040. Where surgeons of ordinary skill recognize more than one method of treatment, it is appropriate for a surgeon to adopt any recognized method of treatment. *Id.* Thus, a particular treatment method may be inappropriate under the facts if that method was not recognized by other surgeons of ordinary skill as an appropriate treatment. Such is not the case here, however.

Here, the trial court instructed the jury as follows:

Unless he states or agrees otherwise, a physician treating a patient impliedly warrants that the physician has and will use that degree of care and skill ordinarily possessed by other physicians practicing in the same field of practice. If a physician exercises sound judgment in selecting from a variety of approved treatments and uses ordinary care and skill in treating a patient, then the physician is not responsible for the treatment's lack of success.

. . . .

Physicians are allowed a wide range in the exercise of their judgment and discretion. They are not limited to the most generally used of several modes of treatment.

When other approved methods of treatment are available, the physician must exercise sound judgment as to the choice of treatment. The fact that other methods existed or that another doctor would have used a different treatment method does not establish malpractice.

As discussed earlier, Fridono essentially sought an instruction that Chuman was obligated to consider other treatment methods and to refer Fridono to physicians who were competent in those treatment methods. However, the instructions above covered the essence of Fridono's requested instruction. *Kranda*, 419 N.E.2d at 1042 ("It is not error to refuse an instruction if the substance is covered by other instructions which are given."); *see also King v. Clark*, 709 N.E.2d 1043, 1046 (Ind.Ct.App.1999) ("[T]he giving of instructions will be reversed only if the instructions given, *as a whole*, failed to advise the jury of the applicable law or misled the jury." (emphasis added)), *trans.*

*denied.* We find no error in the trial court's refusal of Fridono's tendered instruction.

Affirmed.

BAKER, J. and BARNES, J., concur.