Michael A. LINTON, M.D.,
Appellant–Defendant,

v.

Lawanda DAVIS, Appellee–Plaintiff.

No. 45A05–0610–CV–567.

Court of Appeals of Indiana.

June 3, 2008.

Michael E. O'Neill, Richard Girzadas, Patrick Devine, Hinshaw & Culbertson LLP, Schererville, IN, Attorneys for Appellant.

Steve L. Langer, Tara M. Wozniak, Langer & Langer, Valparaiso, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, Michael A. Linton, M.D. (Dr. Linton), appeals the trial court's Order entered on a jury verdict awarding Appellee–Plaintiff, Lawanda Davis (Davis), damages in the amount of one million two hundred fifty thousand dollars resulting from medical mismanagement of Davis' labor and delivery.[1]

We affirm.

### ISSUES

Dr. Linton raises four issues on appeal which we consolidate and restate as the following three issues:

(1) Whether the trial court abused its discretion by admitting into evidence testimony regarding the proceedings and rulings of the Indiana Medical Licensing Board;

(2) Whether the trial court abused its discretion by excluding from evidence the Indiana Medical Review Panel's statutory determination not to forward Dr. Linton's name to the Medical Licensing Board; and

(3) Whether the trial court abused its discretion by disallowing Ivanka

Prcevski (Nurse Prcevski), called as a skilled lay witness pursuant to Ind. Evidence Rule 701, to testify about her perceptions of the baby's well-being during Davis' labor and delivery.

### FACTS AND PROCEDURAL HISTORY

At approximately 8 a.m. on August 5, 2000, Davis arrived at Methodist Hospital in Gary, Indiana, in labor. She was admitted to Labor & Delivery and her progress was monitored throughout the day by the Labor & Delivery nurses. During the course of the day, she was placed on a fetal heart monitor to observe the well-being of the baby. Between approximately 8 and 10 p.m., Dr. Linton and Nurse Prcevski attended to Davis. During this time period, various maneuvers were attempted to help the baby descend through the birth canal. Finally, at 10:15 p.m., Davis delivered her son limp and pale. Despite efforts by a neonatologist to resuscitate the baby, he died of asphyxia four hours later.

On May 8, 2001, Davis filed her Proposed Complaint with the Indiana Department of Insurance. About three years later, on January 19, 2004, the Indiana Medical Review Panel (the Panel) reviewed Dr. Linton's care and rendered its unanimous opinion that: "The evidence supports the conclusion that [Dr. Linton] failed to comply with the appropriate standard of care as charged in the complaint. The conduct complained of was a factor of the resultant damages." (Appellee's App. pp. 1, 3, and 5). Thereafter, on March 12, 2004, Davis filed her Complaint with the trial court alleging medical malpractice against Dr. Linton and The Methodist

---

1. We heard oral argument on October 31, 2007, in the Supreme Court Courtroom. We thank counsel for their eloquent advocacy.

Hospital, Inc.[2]

While the medical malpractice claim was pending before the trial court, the Indiana Medical Licensing Board (the Board), an administrative body charged with the duty and responsibility of regulating the practice of medicine, conducted an administrative proceeding against Dr. Linton. *See* Ind.Code § 25–22.5–2–3. On October 27, 2005, the Board issued its Findings of Fact and Order with regard to allegations of malpractice made by eleven of Dr. Linton's obstetric patients. Concerning Dr Linton's care of Davis, identified as "Patient J.," the Board specifically found that:

> (p) There were numerous deviations from the standard of care in this case.
>
> (q) Dr Linton persisted in the use of oxytocin in the face of a non-assuring fetal heart rate tracing.
>
> (r) Dr. Linton failed to recognize an abnormal labor.
>
> (s) Dr. Linton failed to recognize an arrest of descent (obstructed labor).
>
> (t) Dr. Linton inappropriately used a vacuum at too high a station.
>
> (u) Dr. Linton delayed in performing a caesarean section in a timely manner.

(Appellant's App. pp. 90–91). Based on its detailed findings, the Board ordered Dr. Linton "placed [on] indefinite probation,"

with certain terms and conditions. (Appellant's App. p. 96).

Davis' medical malpractice Complaint was originally set to proceed to trial by jury on June 5, 2006. However, on April 20, 2006, Dr. Linton filed his "Motion to Bar all References to, and Evidence Relating to, [the Board] Action against [Dr. Linton]."[3] (Appellant's App. p. 61). Consequently, the trial court addressed the admissibility of the Board's considerations with regard to Dr. Linton's medical license in several pre-trial hearings. During a pre-trial hearing on June 1, 2006, the trial court denied Dr. Linton's motion and entered the following Order, in pertinent part:

> 8. [Dr. Linton's] "Motion to Bar all References to, and Evidence Relating to, the [Board] Action Against [Dr. Linton]" is denied, [Davis] is allowed to introduce into evidence Finding 15, q, r, s, t, u and the Order from [the Board] entitled State of Indiana vs. [Dr. Linton] file stamped October 28, 2005. This [c]ourt finds that evidence of [the Board's] action related to [Davis] is admissible to impeach in a variety of circumstances, including if Dr. Farb[4] testifies that he is a consultant for the Minnesota Licensing Board or if Dr. Linton testifies as to the standard of care in this case. If [Davis] introduces such evidence, [Dr. Linton]

---

2. Davis' Complaint against The Methodist Hospital, Inc. was dismissed on May 8, 2006, pursuant to a stipulation agreed to and signed by all parties.

3. One day later, on April 21, 2006, Davis filed, by certified mail, a Motion to Exclude Testimony of Defense on Liability due to Collateral Estoppel, aimed at preventing Dr. Linton from relitigating the Board's holding that Dr. Linton deviated from the standard of care during Davis' labor and delivery. Collateral estoppel bars the subsequent litigation of a fact or issue which was necessarily adjudicated in a former lawsuit if the same fact or issue us presented in the subsequent lawsuit.

*See, e.g., Shell Oil Co. v. Meyer,* 705 N.E.2d 962, 968 (Ind.1998), *reh'g denied.* The determination of an issue or fact made by an administrative agency can, under certain circumstances, estop the same issue or fact from being litigated in a state court action involving those same issues or facts. *See, e.g., Watson Rural Water Co., Inc. v. Ind. Cities Water Corp.,* 540 N.E.2d 131, 135 (Ind.Ct.App.1989), *reh'g denied, trans. denied.* Davis subsequently withdrew this motion on May 9, 2006.

4. Dr. Farb, a consultant for the Minnesota Board of Medical Practice, was listed as a defense witness, but never took the stand.

may introduce additional evidence concerning [the Board's] findings if he so chooses. This [c]ourt also finds that Dr. Linton's medical license history and status is relevant during trial if Dr. Linton testifies as a witness.

(Appellant's App. p. 30). On June 30, 2006, Dr. Linton filed his Petition to Certify Interlocutory Appeal seeking appellate review of the trial court's Order. On July 17, 2006, the trial court denied Dr. Linton's petition.

September 5, 2006 through September 11, 2006, a jury trial was held. At trial, Davis called Dr. Linton as a witness in her case-in-chief. While examining Dr. Linton, Davis asked the witness's opinion on the standard of care he provided to Davis. Specifically, the following colloquy ensued:

[DAVIS]: You believe you adhered to the standard of care?

[Dr. LINTON]: Yes, I do

[DAVIS]: Now, Doctor, as you sit here today, you don't practice obstetrics anymore, do you?

(Transcript p. 728). Dr. Linton immediately objected to this line of questioning. The trial court overruled Dr. Linton's objection and Davis introduced evidence regarding the Board's Order limiting Dr. Linton's license to practice medicine in Indiana. On cross-examination, Dr. Linton attempted to explain to the jury the Board's Order, including the number of cases investigated by the Board and its conclusion.

After Davis rested her case-in-chief, Dr. Linton called his only witness, Nurse Prcevski. The purpose of her testimony was to explain her role and introduce perceptions concerning Davis' labor. Favorably responding to Davis' objections, the trial court denied into evidence Nurse Prcevski's statements that she was continuously monitoring the baby's well-being and reporting this information to Dr. Linton. At the close of the evidence, the jury returned a verdict in favor of Davis in the amount of one million, four hundred thousand dollars, which the trial court reduced to the statutory limit of one million, two hundred and fifty thousand dollars.

Dr. Linton now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION [5]

### I. *Standard of Review*

 The parties request us to decide three issues of first impression, all revolving around the admissibility of evidence. The decision to admit or exclude evidence rests within the sound discretion of the trial court. *City of Gary v. McCrady*, 851 N.E.2d 359, 363 (Ind.Ct.App.2006). The trial court's determination is afforded great discretion on appeal. *Id.* To that end, we will not reverse the trial court's decision absent a showing of manifest abuse of discretion. *Id.* An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before it or it misinterprets the law. *Matzat v. Matzat*, 854 N.E.2d 918, 919 (Ind.Ct.App.2006). Even if a trial court errs in a ruling on the admissibility of evidence, we will only reverse if the error is inconsistent with substantial justice. *Fairfield Development Inc. v. Georgetown Woods Senior Apartments Ltd.*, 768 N.E.2d 463, 466–67 (Ind. Ct.App.2002), *trans. denied.* To determine whether an evidentiary error requires reversal, we assess the probable impact upon the trier of fact. *Wohlwend*

---

5. We hereby deny Davis' Motion to Strike Portions of Appellant's Reply Brief, filed October 5, 2007.

*v. Edwards,* 796 N.E.2d 781, 789 (Ind.Ct. App.2003).

## II. *The Indiana Medical Licensing Board*

Dr. Linton first asserts that the trial court abused its discretion by admitting into evidence the Board's proceedings and findings. Essentially, Dr. Linton's numerous arguments can be consolidated into three main claims. First, Dr. Linton elaborates on the different purpose served by the Panel versus the Board and its different burden of proof. Next, he claims the admission into evidence of the Board's findings to be overly prejudicial and irrelevant to the decision whether Dr. Linton breached the standard of care in his treatment of Davis. Finally, he characterizes Davis' conduct of calling him as a witness in her case-in-chief a "subterfuge to force open the door for the admission of" the Board's findings. (Appellant's Brief p. 23).

### A. *Different Purpose, Different Burden of Proof*

The Indiana Medical Malpractice Act was adopted in 1975 in an effort to maintain the availability of healthcare services in Indiana that were believed to be eroded by tort suits, and to help control the costs of medical liability insurance, litigation, settlements, and excessive judgments against healthcare providers. *Mayhue v. Sparkman,* 653 N.E.2d 1384, 1386 (Ind. 1995). The statute established the framework for pursuing medical malpractice claims in Indiana. Specifically, it requires that, before a lawsuit is pursued, the Panel determines whether the physician's behavior constituted malpractice and whether that malpractice caused the plaintiff's injury. *Id.* The conclusion of the Panel is not decisive. *Id.* Here, the Panel unanimously found that Dr. Linton had committed medical malpractice in his treatment of Davis. By statute, the Panel's expert opinion is

admissible as evidence in a subsequent civil trial. I.C. § 34–18–10–23. The Panel is also charged with the responsibility to make a written determination as to whether or not the defendant physician's name should be forwarded to the Board for further investigation in that forum. I.C. § 34–18–9–4. However, this determination is not admissible evidence in a civil action.

On the other hand, the Board is a ministerial body, instilled with the duty and responsibility to regulate the practice of medicine within the State of Indiana. I.C. § 25–22.5–2–7. Unlike the Panel's opinion, there is no statutory authority for admitting the Board's determinations into evidence at a civil trial.

Focusing on the fact that "the proceedings before administrative bodies are not required to be conducted with all of the procedural safeguards afforded by judicial proceedings," Dr. Linton asserts "with an absolute certainty" that the jury was thoroughly confused by the Board's order and the weight it should be given. *Lind v. Medical Licensing Bd. of Ind.,* 427 N.E.2d 671, 684 (Ind.Ct.App.1981); (Appellant's Br. p. 18). Dr. Linton clarifies that, in arriving at its decision, the Board applied a different standard of review than is applied in a medical malpractice action. Pursuant to Ind. Admin. Code tit. 844, r. 5–1–1, the Board's definition of professional incompetence "may include, but is not limited to, *a pattern or course of repeated conduct* by a practitioner demonstrating a failure to exercise such reasonable care and diligence as is ordinarily exercised by practitioners in the same or similar circumstances in the same or similar locality" (emphasis added). In this light, the Board reviewed eleven cases before concluding that Dr. Linton's medical license should be placed on indefinite probation. Thus, Dr. Linton argues that by admitting the

Board's determination, the trial court effectively invited the jury to decide whether Dr. Linton was negligent and proximately caused Davis' alleged damages based upon the Board's determinations, when in fact, the Board itself never made any determinations specific to the issue of medical malpractice in Davis' case.

■ Our review of the record reveals that the trial court gave the jury limiting instructions concerning the Panel and the Board. Specifically, Final Instruction 20 provides, in relevant part, that "[t]he report of the [Panel] is not conclusive on any of the issues that you are to decide and you may give it such weight as you deem appropriate." (Tr. p. 1269). With regard to the Board, the trial court declared in Final Instruction 28, in relevant part, that:

> The evidence presented regarding the review by the [Board] has been admitted for the limited purpose of establishing the status of [Dr. Linton's] medical license at the time of the trial of this matter. You may also consider this evidence in assessing the credibility of [Dr. Linton].
>
> This evidence is not to be treated by you as conclusive proof of any fact for your determination in this trial.

(Tr. p. 1277).

■ It is well established that on appeal, we will presume the jury followed the law contained within the trial court's instruction and applied that law to the evidence before it. *Pendleton v. Aguilar*, 827 N.E.2d 614, 621 (Ind.Ct.App.2005). We refuse to attempt to interpret the thought process of the jury in arriving at its verdict. *Id.* Accordingly, we must conclude that the jury followed the limiting instructions and gave the appropriate weight to the Panel and Board's Orders.

### B. The Board's Determination and Specific Findings

Next, Dr. Linton argues that the trial court abused its discretion by admitting into evidence the Board's determination of his license restriction and its specific findings with regard to Davis' care. Because this is an issue of first impression in Indiana, Dr. Linton references out-of-state cases which apply Evid. R. 402, 403 and 404(b) to exclude similar evidence.

As a preliminary matter, we refer to Indiana Evidence Rule 611(c), which provides that "[w]henever a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions." As such, Davis was entitled to call Dr. Linton during his case-in-chief.

### 1. The Board's Determination of Probation

Here, the Board examined Dr. Linton's obstetrical care of eleven patients, one of which was Davis. With regard to Davis' care, the Board specifically found that:

(p) There were numerous deviations from the standard of care in this case.

(q) Dr Linton persisted in the use of oxytocin in the face of a non-assuring fetal heart rate tracing.

(r) Dr. Linton failed to recognize an abnormal labor.

(s) Dr. Linton failed to recognize an arrest of descent (obstructed labor).

(t) Dr. Linton inappropriately used a vacuum at too high a station.

(u) Dr. Linton delayed in performing a caesarean section in a timely manner

(Appellant's App. pp. 90–91). Based on its combined findings in the eleven cases, the Board ordered Dr. Linton "placed [on] indefinite probation," with certain terms and conditions. (Appellant's App. p. 96).

During trial, Davis called Dr. Linton as her witness pursuant to Evid. R. 611(c). While examining Dr. Linton, Davis asked the witness's opinion on the standard of care he provided to Davis. In particular, the following colloquy ensued:

[DAVIS]: You believe you adhered to the standard of care?

[Dr. LINTON]: Yes, I do.

[DAVIS]: Now, Doctor, as you sit here today, you don't practice obstetrics anymore, do you?

(Tr. p. 728). After Dr. Linton's objection to this last question was overruled, Davis inquired about the restrictions placed on his license by the Board.

 First, we note that Dr. Linton never objected to Davis' question about his care which led to the immediate introduction of his license restriction. Failure to timely object waives the error for review. *See Everage v. Northern Indiana Public Service Co.*, 825 N.E.2d 941, 948 (Ind.Ct. App.2005). Waiver notwithstanding, we conclude Davis could properly question Dr. Linton as to the standard of care and his opinion as to whether he met that standard. In this regard, several out-of-state decisions provide guidance on the trial testimony of a defendant-physician concerning his compliance with the appropriate standard of care offered to patients. *See, e.g., McDermott v. Manhattan Eye, Ear & Throat Hospital,* 15 N.Y.2d 20, 255 N.Y.S.2d 65, 203 N.E.2d 469, 473 (1964); *Waterman v. Damp,* 2006 WL 2872432 (Tenn.Ct.App.2006). Researching our sister states' case law, we find divergent opinions handling the issue at bar. While recognizing the right of a plaintiff in a malpractice action to call as a witness the defendant-doctor, the courts of several states have sought to limit the type of questions that the plaintiff may put to him. *McDermott,* 255 N.Y.S.2d 65, 203 N.E.2d at 473. Specifically, it has been held that a defendant physician may be required to testify to "facts within his knowledge" that is, "what he actually saw and did" but not as to whether his actions deviated from the accepted standard of medical practice in the community, a matter deemed to call for "expert opinion." *Id.* (numerous citations to other cases omitted). Other courts, however, permit the plaintiff to examine his doctor-opponent as freely and fully as he could any other qualified witness. *Id.* (numerous citations to other cases omitted).

In *McDermott,* the court found the latter decisions to be more enlightened. *See id.* The *McDermott* court reasoned:

That the defendant is an expert and that the particular questions asked of him are those which only an expert can answer, seem beside the point. It is at least arguable that the doctor's knowledge of the proper medical practice and his possible awareness of his deviation from that standard in the particular case are, in a real sense, as much matters of fact as are the diagnosis and examination he made or the treatment upon which he settled. More importantly, however, by allowing the plaintiff to examine the defendant doctor with regard to the standard of skill and care ordinarily exercised by physicians in the community under like circumstances and with regard to whether his conduct conformed thereto, even though such questions call for the expression of an expert opinion, the courts do not more than conform to the obvious purpose underlying the adverse-party-witness rule. That purpose, of course is to permit the production in each case of all pertinent and relevant evidence that is available from the parties to the action. The issue whether the defendant-doctor deviated from the proper and approved practice customarily adopted by physi-

cians practicing in the community is assuredly pertinent and relevant to a malpractice action.

*Id.* at 474–75 (internal citations omitted). We agree.

Because Dr. Linton was properly questioned as to the standard of care provided to Davis, he was testifying as an expert and as such could be impeached with his licensure status. In *Fridono v. Chuman,* 747 N.E.2d 610, 610 (Ind.Ct.App.2001), *trans. denied,* Fridono filed a medical malpractice action against Dr. Chuman alleging that he failed to comply with the applicable standard of care in performing a cervical laminectomy. *Id.* at 610. At trial, Fridono presented the testimony of Dr. William Fisher (Fisher) in support of his theory that the surgery performed by Dr. Chuman was unnecessary. *Id.* at 615. In qualifying Fisher as an expert, Fridono questioned him about his credentials at Northwestern Medical School. *Id.* On cross-examination, Dr. Chuman asked Fisher if his privileges at Northwestern had ever been restricted. *Id.* At that point, Dr. Chuman presented a letter agreement between Fisher and Northwestern that imposed restrictions on his privileges as a result of a peer review process. *Id.* References to the peer review committee and process were redacted, but not the specific restrictions placed on Fisher. *Id.* Dr. Chuman used the document to impeach Fisher and challenge his qualifications as an expert. *Id.* Fridono objected to the use of the document. *Id.*

Interpreting the Peer Review statute, I.C. § 34–30–15–1, we reiterated its purpose as fostering effective review of medical care by permitting the members of the peer review panel to communicate candidly, objectively, and conscientiously. *Id.* at 618. We were mindful not to distort a privilege by applying it to circumstances where the policy behind the rule is not served. *Id.* Viewing this purpose in light of the peer review process, we concluded that "disclosure of the results or consequences of a proceeding is not inconsistent with the purpose of the privilege." *Id.* However, we determined that the opinions of the committee members, their discussions, documents created during deliberations, and the process itself are protected and could not be entered into evidence. *Id.* As a result, we found that only the final action taken as a result of peer review proceedings is discoverable and admissible in judicial proceedings. *Id.* at 620.

 We find the same rationale applicable here. The record reflects that the Board's investigation into allegations of Dr. Linton's medical malpractice includes opinions and discussions between the Board's members about the performance of Dr. Linton's duty, documents created as a result thereof, and the Board's ultimate recommendation of probation. These proceedings are part of an internal method used by the medical community to ensure proper and effective medical care. Therefore, in light of *Fridono,* we conclude that the licensure status of a physician who gives an expert opinion is admissible to impeach the doctor's opinion. The Board's specific findings regarding the care of a particular patient, however, are not admissible in a judicial proceeding.

Nevertheless, our review does not end here as the trial court did admit the Board's specific findings concerning Dr. Linton's care of Davis.

### C. *Opening the Door for the Board's Specific Findings*

Dr. Linton asserts that Davis only called him as a witness for the sole purpose of presenting otherwise inadmissible evidence cloaked as impeachment. Specifically, Dr. Linton maintains that because Davis introduced the Board's ultimate finding of his

license suspension into evidence, he was forced to elaborate upon the Board's specific findings on cross-examination otherwise the jury would have been left with the incorrect impression that the Board solely investigated Davis' case instead of a total of eleven different cases spanning sixteen years. Dr. Linton claims that he was forced to present this elaborate testimony because he had no other choice when confronted with Davis' "subterfuge." (Appellant's App. p. 23).

Although pursuant to Evid. R. 607, the credibility of a witness may be attacked by any party, including the party calling the witness, a party is forbidden from placing a witness on the stand when the party's sole purpose in doing so is to present otherwise inadmissible evidence cloaked as impeachment. *Griffin v. State,* 754 N.E.2d 899, 904 (Ind.2001). Here, the record reveals that during Davis' questioning of Dr. Linton the following exchange took place:

[DAVIS]: Now, Doctor, I want to talk to you now, you heard [the doctors on the Panel] come in and criticize the way you managed the labor on August 5, 2000. You heard their opinions[,] right?

[Dr. LINTON]: But they were not there.

[DAVIS]: Did you hear their opinions?

[Dr. LINTON]: I heard it.

[DAVIS]: Whether they're there or not there, as you sit here and testify to this jury today, do you agree that their criticisms of you are right?

[Dr. LINTON]: No, I don't.

[DAVIS]: You believe you adhered to the standard of care?

[Dr. LINTON]: Yes, I do.

[DAVIS]: Now, Doctor, as you sit here today, you don't practice obstetrics anymore, do you?

[COUNSEL FOR Dr. LINTON]: I'm going to object, your Honor. May we approach the bench?

THE COURT: Yes, you may.

(The following proceedings were held at the bench in the presence of the jury as follows:)

[COUNSEL FOR Dr. LINTON]: For the record, your Honor, and I know this has been briefed and argued to death, but just for the record, I don't believe it's relevant to inquire into opening the door on an examination which is really a cross examination to the doctor's status in the here and in the now. I think all that's relevant is what the doctor's licensing status and what type of practice he had at the time of this occurrence.

THE COURT: With my previous ruling stand in this line of questioning is permitted.

[COUNSEL FOR Dr. LINTON]: May I—your Honor, may we have on the record a stipulation that the objections to this line of questioning are preserved—

THE COURT: It will be continuing—objection continuing—

[DAVIS]: I agree.

THE COURT: Okay. Great. Thank you.

(The following proceedings were held in the presence of the jury as follows:)

THE COURT: The objection is overruled and the questioning may continue.

[DAVIS]: Doctor, you no longer practice obstetrics; right?

[Dr. LINTON]: That's correct.

[DAVIS]: You've given up your privileges at St. Catherine Hospital to do obstetrics; correct?

[Dr. LINTON]: That's correct.

[DAVIS]: And at Methodist Hospital; correct?

[Dr. LINTON]: That's correct.

[DAVIS]: And, Doctor, your license is on indefinite probation; correct, Doctor?

[Dr. LINTON]: That's correct.

[DAVIS]: And, Doctor, and you are restricted to practicing medicine other than in a group practice; right?

[Dr. LINTON]: That's correct.

[DAVIS]: And you're required to have somebody supervise your practice; correct?

[Dr. LINTON]: Are you going to allow [me] to explain why this has happened?

[DAVIS]: No.

[Dr. LINTON]: No, you wouldn't, okay.

[DAVIS]: You're required to have someone review your medical records and report the [B]oard; correct, Doctor?

[Dr. LINTON]: That's correct.

[DAVIS]: Doctor, you agree that on August 5, 2000, you knew that the only way [the baby] could get oxygen is from the placenta through the umbilical cord? You knew those things; right?

[Dr. LINTON]: Yes, I do.

(Tr. pp. 727–30). Despite Dr. Linton's apparent request to elaborate as to the reason why his license was suspended, Davis merely questioned Dr. Linton about the limitations placed on his medical license by the Board. Davis continued her direct investigation, inquiring into Dr. Linton's actions and decisions on August 5, 2000.

Next, Dr. Linton's counsel cross-examined his client. After allowing Dr. Linton to introduce himself and elaborate on his educational background, counsel entered into the following line of questioning with regard to the Board, its proceedings and its findings:

[Dr. LINTON'S COUNSEL]: Now, Doctor, [Davis] mentioned the question of the [Board]. Did there come a time when the [Board] investigated you?

[Dr. LINTON]: Yes. I—the problem with practicing in Gary, which is a problem with most obstetricians across the nation, is malpractice lawsuits. The patient population we take care of—believe that apart from winning the lotto, suing a doctor is the next best thing. So we have a lot of lawsuits. In 25 years, I've had 22 lawsuits. Most of which I've won. Never—this is the first time I've been in trial. The [Board]—I don't know how it got selected—because there have been people, doctors, in Gary who have more lawsuits than I do. They were never selected. I don't know who was behind it, but I got selected to be investigated by the [Board].

[Dr. LINTON'S COUNSEL]: Now, Doctor, just to interrupt you, tell me were there, on just a certain number of the cases that you've talked about, the 22 lawsuits that the [Board] investigated?

[Dr. LINTON]: The [Board] investigated 11 cases. 7 of those cases, I won outright on medical review level. The cases were dropped, 7 out of those 11. Three of them there was payment made, but these were more than ten years ago when I started practice. Then there are three pending including this one.

[Dr. LINTON'S COUNSEL]: Okay. Now, Doctor, all of these—this investigation and the selection you had of you coming down to the [Board] in Indianapolis, did it happen—or was that going on in 2000 when you treated Lawanda Davis?

[Dr. LINTON]: No. All this happened in 2004. When I treated Lawanda Davis, none of this was going on.

[Dr. LINTON'S COUNSEL]: Now, after—it had started in 2004. Did a time come where a hearing was held, where you had your chance to go before the [Board]—

[Dr. LINTON]: Yeah. I went before a [Board]. There was not a single person on that [B]oard that did deliveries. There was one neonatologist; one, I think, dermatologist, a plastic surgeon, a urologist. They were different specialties, but nobody did a delivery. 1 of the 11 cases, after a two-day hearing, the [B]oard refused to suspend my license or revoke my license.

[Dr. LINTON'S COUNSEL]: What did they do rather than suspending your licensing or revoking or taking your license away?

[Dr. LINTON]: They decided to put me on probation. And I don't know, the way I saw it is—I hope you guys understand when somebody puts you on probation, it means they're watching what you're doing. That's the way I understood it. My license was not suspended. It was not revoked. I was allowed to continue to practice the same way I have practiced prior to the hearing, except they said that some of my charts have to be reviewed by a physician, that I have to take some courses which I've already completed, and to have a review process which I have already completed. My decision to stop OB—

[Dr. LINTON'S COUNSEL]: Let me ask you a question though, so we don't get an objection that this is a narrative.

[Dr. LINTON]: Okay.

[Dr. LINTON'S COUNSEL]: That was my next question. [Davis] raised an issue about your privileges at Methodist and at St. Catherine's that you no longer have that. Can you explain to the jury why it is you don't have privileges to do OB any longer.

[Dr. LINTON]: The decision to stop doing OB was made by me, wasn't—the [B]oard did not ask me to stop doing OB. I'm not the only obstetrician across the nation who has stopped doing OB.

It's across the nation—there are too many lawsuits.

They're—this is the only profession whenever something goes wrong, there's no God. We are responsible. They blame us. It's our fault. So many OBs across the nation are stopping to do OB. I'm going to be 60 years old in May. So I've done 6,000 deliveries. I think it's my time to stop doing OB. So that was my decision. It wasn't the request of the [B]oard.

(Tr. pp. 756–60). Dr. Linton's counsel continued his cross-examination by talking Dr. Linton through the medical circumstances surrounding Davis' labor and delivery and clarifying Dr. Linton's responses to Davis' medical questions. No further mention was made about the Board or its findings.

On re-direct, Davis initially questioned Dr. Linton's medical decisions on August 5, 2000, and then, as a secondary line of questioning, pursued the Board's proceedings and its findings, asking the following:

[DAVIS]: Now, the [Board] determined that you were incompetent; right?

[Dr. LINTON]: I don't think that's what they said.

. . .

[DAVIS]: Did I read this right, Doctor, "Ultimate Finding of Fact, 1, [Dr. Linton's] conduct violates laws—I'm sorry—conduct constitutes violations of the laws governing the practice of medicine in the State of Indiana by continuing to practice although the practitioner has become unfit to practice due to professional incompetence." Did I read this right?

[Dr. LINTON]: Wait a minute. Is that the final finding? I have to see what—

. . .

[DAVIS]: Now, the second finding, ultimate finding was your conduct constitutes violations of the regulations of laws governing the practice of medicine in the State of Indiana by failing to give a truthful, candid and reasonably complete account of the patient's condition?

[Dr. LINTON]: That's correct.

[DAVIS]: Now, you disagreed with that.

[Dr. LINTON]: I disagree with that.

(Tr. pp. 831–33). Continuing her interrogation, Davis first discussed the Board's votes, Dr. Linton's continued medical education requirements, and his decision to stop his obstetrics practice. Next, Davis returned to Dr. Linton's medical decisions during her labor and delivery.

Proceeding to re-cross examination, Dr. Linton's counsel initiated questions concerning the Board's proceedings:

[Dr. LINTON'S COUNSEL]: Doctor, how many cases of yours did the [Board] look at and review during the course of its investigation and the two-day hearing?

[Dr. LINTON]: 11 cases.

[Dr. LINTON'S COUNSEL]: And was the Lawanda Davis case one of those 11 cases?

[Dr. LINTON]: Yes.

[Dr. LINTON'S COUNSEL]: And how many years—how many year period did those 11 cases stretch over?

[Dr. LINTON]: About 20 years.

[Dr. LINTON'S COUNSEL]: Now, Doctor, and I really don't want to dwell on this, just finish explaining to the jury what happened after you got the [Board's] [O]rder in October. You got us through to February, and can you please continue and tell us just your impressions of what it is that transpired from February until this June [O]rder where the [B]oard made—entered an-

other order telling you to go get these things done as they had told you to do earlier.

[Dr. LINTON]: Okay. When we first received the [O]rder, we contested the [O]rder because I had stopped doing deliveries, C-sections. So we felt that— my lawyer and I—that there's no reason to go through 20 credits of high risk obstetrics since I'm no longer doing delivery. And those things we submitted to the [B]oard. They set a hearing. The hearing was postponed. Then when I went in for my four month meeting, the [B]oard said that we failed to do what they asked me to do. Our argument to them was the reason we didn't do it because we were asking for modification. We were asking for a change of what you required me to do. They said that they will still insist that I do that. That's where the vote of 5 to 0 came, that I should go back and do all the things I was asked to do. So that's how that vote of 5 to 0 came about.

(Tr. pp. 851–52). Dr. Linton finished his testimony by responding to Davis' questions regarding the Board's findings of his treatment of Davis during her second redirect.

■ Analyzing Dr. Linton's complete testimony as presented by both counsels, we do not find Davis to be guilty of a subterfuge. Besides the numerous references to the Board, its proceeding and its ultimate findings, this was not Davis' sole purpose of calling him as her witness. Although we only included three specific pages of the transcript in this opinion, Davis' entire direct interrogation of Dr. Linton comprises twenty-eight pages. These twenty-eight pages reveal Davis' attempt to clarify Dr. Linton's medical procedures and decisions on the afternoon and evening of August 5, 2000. Accordingly,

we cannot conclude that Davis' mere purpose of calling Dr. Linton was to present otherwise inadmissible evidence cloaked as impeachment. *See Griffin,* 754 N.E.2d at 904. '

Furthermore, Dr. Linton's testimony concerning the Board reveals that Davis' questions on direct were strictly limited to the Board's ultimate determination of probation. Even faced with Dr. Linton's request to explain, Davis refused to further delve into the Board's proceedings and specific findings with regard to the eleven individual cases. However, on cross-examination, Dr. Linton's counsel introduced the Board's analysis of eleven cases and Dr. Linton's hearing before the Board. Next, on re-direct, Davis limited her questioning again to focus solely on the Board's ultimate decision of probation. And as before, on re-cross, Dr. Linton's counsel elaborated on the Board's underlying analysis of eleven cases.

Dr. Linton now asserts that he was forced to elaborate on cross-examination otherwise the jury would have been left with the incorrect impression that the Board solely investigated Davis' case instead of a total of eleven different cases. However, as Davis' introduction of the Board's ultimate finding did not allude to any underlying investigation of individual cases, we fail to see how the jury could have been left with the wrong impression after Davis' direct interrogation of Dr. Linton. Only after Dr. Linton's counsel elaborated on the eleven individual cases on re-cross, was the jury introduced to the Board's detailed analysis. Accordingly, we find that because Dr. Linton opened the door to the Boards specific findings which would otherwise have been inadmissible, the trial court properly allowed the introduction of the findings. *See, e.g., Crafton v. State,* 821 N.E.2d 907, 910 (Ind.Ct.App. 2005). Thus, the trial court did not abuse

its discretion by admitting the Board's findings.

### III. *The Medical Review Panel's Determination*

As his second main issue, Dr. Linton claims that the trial court abused its discretion by refusing to admit into evidence the Panel's determination not to forward his name to the Board. I.C. § 34-18-9-4 provides, in pertinent part, that:

The medical review panel shall make a separate determination, at the time it renders its opinion ..., as to whether the name of the defendant health care provider should be forwarded to the appropriate board of professional registration for review of the health care provider's fitness to practice the health care provider's profession. The commissioner shall forward the name of the defendant health care provider if the medical review panel unanimously determines that it should be forwarded. The medical review panel determination concerning the forwarding of the name of the defendant health care provider is not admissible as evidence in a civil action.

In the instant case, the Panel reached the unanimous conclusion not to forward Dr. Linton's name to the Board.

Seizing on the plain language of the statute, Dr. Linton argues that only the determination of "forwarding" is inadmissible, not a determination "not to forward." Referencing the principle of expression *unius est exclusion alterius,* he alleges that if the legislature had intended to statutorily exclude all determinations by the Panel, it could have specified as such in the statute.

The interpretation of a statute is a legal question that is reviewed *de novo. Sun Life Assur. Co. of Canada v. Ind. Dept. of Ins.,* 868 N.E.2d 50, 55 (Ind. Ct.App.2007). Statutory interpretation is

the responsibility of the court and within the exclusive province of the judiciary. *Id.* The first and often the last step in interpreting a statute is to examine the language of the statute. *Id.* When confronted with an unambiguous statute, we do not apply any rules of statutory construction other than to give the words and phrases of the statute their plain, ordinary, and usual meaning. *Id.*

While Dr. Linton emphases the single and final phrase "concerning the forwarding of the name," we view the statute as a whole. *See* I.C. § 34–18–9–4. Considering the statute in this light, we note that the statute commences with the sentence "as to *whether* the name ... should be forwarded...." *See* I.C. § 34–18–9–4 (emphasis added). "Whether" is a conjunctive, used in indirect questions to introduce one alternative. WEBSTER'S II, 1257 (2001). Accordingly, the language used necessary includes both options: to forward or not to forward.

Furthermore, Dr. Linton's partial dissemination of the statutory language is misplaced. The phrase "determination concerning the forwarding" cannot be wrestled from the context it is used. As the "determination" refers back to the Panel's decision as to "whether to forward," it not only includes forwarding, but must also encompass the decision not to forward. Thus, viewing the unambiguous language of the entire statute as a whole, we affirm the trial court's exclusion of the Panel's determination not to forward Dr. Linton's name to the Board, pursuant to I.C. § 34–18–9–4.

### IV. *Nurse Prcevski's Testimony*

As his third and final issue, Dr. Linton contends that the trial court abused its discretion by limiting Nurse Prcevski's trial testimony. In essence, the main dispute between the parties concerns the qualification of Nurse Prcevski's testimony. While Dr. Linton considers her to be a skilled lay witness pursuant to Evid. R. 701, Davis refers to her as an expert witness, in accordance with Evid. R. 702.

"Qualification under Rule 702 (and hence designation as an expert) is only required if the witness's opinion is based on information received from others pursuant to [Evid. R.] 703 or on a hypothetical question." *Farrell v. Littell*, 790 N.E.2d 612, 617 (Ind.Ct.App.2003). However, the testimony of an observer, skilled in an art or possessing knowledge beyond the ken of the average juror may be nothing more than a report of what the witness observed, and therefore, admissible as lay testimony. *Id.* This type of evidence is not a matter of "scientific principles" governed by Evid. R. 702(b), rather, it is a matter of the observations of persons with specialized knowledge. *Id.*

Such witnesses possessing specialized knowledge are often called skilled witnesses or skilled lay observers. *Mariscal v. State*, 687 N.E.2d 378, 380 (Ind.Ct.App. 1997), *reh'g denied, trans. denied.* A "skilled witness" is a person with "a degree of knowledge short of that sufficient to be declared an expert under Evid. R. 702, but somewhat beyond that possessed by the ordinary jurors." *Id.* Skilled witnesses not only can testify about their observations, they can also testify to opinions or inferences that are based solely on facts within their own personal knowledge. *Id.* In order to be admissible under Evid. R. 701, opinion testimony of a skilled witness or lay observer must be "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." *Id.*

In support of their respective positions, both parties refer to this court's opinion in *Stryczek v. Methodist Hospitals, Inc.*, 694

N.E.2d 1186 (Ind.Ct.App.1998), *trans. denied*. In *Stryczek*, a nurse specifically concluded in her affidavit that the Hospitals' deviation from the applicable standards of care resulted in the victim's cardiac damage. *Id.* at 1189. Analyzing earlier case law, we stated that "[i]n an action for [medical] malpractice, whether the defendant used suitable professional skill must generally be proven by expert testimony, that is, other physicians, surgeons, or orthodontists, as the case may be." *Id.* (quoting *Stackhouse v. Scanlon*, 576 N.E.2d 635, 639 (Ind.Ct.App.1991), *trans. denied*). Where the offered witness does not have the "same education, training or experience [as that of the defendant], all of which are generally necessary to render an opinion of the benefit to a jury," the witness is generally not qualified to serve as an expert. *Id.* Because we found the nurse did not have the same education or training as a physician, we concluded that she could not offer expert testimony on the standard of care for physicians.

We find *Stryczek* to be inapposite to the case at hand. Unlike *Stryczek*, Nurse Prcevski did not intend to testify as to the standard of care applicable to Dr. Linton. Rather, she intended to testify as to her own perceptions of the baby's fetal heart monitor strips from 7:30 till 10:00 p.m. and reasonable inferences derived from those perceptions. Specifically, in his offer of proof Dr. Linton established that Nurse Prcevski would testify to the following:

Pursuant to Indiana Rule of Evidence 103(a)(2), [Dr. Linton] hereby makes his offer of proof on the excluded testimony of Nurse [Prcevski].

Number 1, if Nurse [Prcevski] had been permitted to testify about the course of her shift with [Davis], on 08.05.2000, she would have testified that:

A. From 7:30 to 10:00 p.m., she was continuously performing auscultation and palpation procedures to monitor the heart rate of the fetus and the strength and duration of the fetus' contrac—or the mother's contractions. She also performed at least one ultrasound that showed the baby was doing well.

B. During periods where the fetal heart monitor strips were non-diagnostic, Nurse [Prcevski] was auscultating and palpating and relaying the information to Dr. Linton, that the fetus was doing well.

Number [2]: In 2000, Nurse [Prcevski] was qualified to start and stop Pitocin without a physician's order.

Number [3]: From 7:30 to 10:00 p.m., Nurse [Prcevski] saw no need to stop the Pitocin being administered to [Davis] because she felt the contractions were not too strong and the fetus was doing well throughout this period of time.

That's my offer, your Honor, with respect to the nurse.

(Tr. pp. 1161–62).

■ In light of this offer of proof, Nurse Prcevski should have been qualified as a skilled lay witness.[6] The record es-

---

6. Here, the record reflects that Nurse Prcevski had not been disclosed as an expert witness. Accordingly, under the facts of this case, Dr. Linton attempted to qualify her as a skilled witness pursuant to Evid. R. 702. However, our opinion today should not be construed as a limitation on the qualification of nurses as expert witnesses under Ind. Evid. R. 702. A registered nurse holds a license issued by the State of Indiana and "bears primary responsibility and accountability for nursing practices based on specialized knowledge, judgment and skill derived from the principles of biological, physical, and behavioral sciences." I.C. § 25–23–1–1.1. As such, a registered nurse testifying in a medical malpractice case could equally testify as an expert witness "qualified by knowledge, skill,

tablishes that she is a registered nurse with more than thirty years of experience, and was assigned to Davis during her labor and delivery. As the nurse on duty, she was responsible to assess the baby's well-being by reading and recording the child's baseline heart rates on the monitor strips, short and long-term variability, and accelerations and decelerations. Thus, she clearly is a witness, possessing specialized nursing knowledge, short of that sufficient to be declared an expert under Evid. R. 702, but somewhat beyond that possessed by the ordinary jurors. *See Mariscal,* 687 N.E.2d at 380. Accordingly, she can testify about her observations concerning the baby's heart rate monitor strips and her inferences derived thereof. *See id.* As such her testimony should have been admitted under Evid. R. 701 as her intended testimony was rationally based upon her observations during Davis' labor and delivery and might have been helpful to the jury to further their education. *See id.*

Nevertheless, we find the trial court's improper exclusion of Nurse Prcevski to be harmless. The record reflects that Dr. Linton was present in Davis' room from 7:30 till 10:00 p.m., the time period Nurse Prcevski intended to cover through her testimony. During his testimony, Dr. Linton testified at length about Davis' labor and its complications. He clarified and explained in detail the heart monitor strips with its annotations to the jury. Therefore, Nurse Prcevski's testimony would have been merely cumulative to Dr. Linton's. As we stated before, any error caused by the admission of evidence is harmless error for which we will not reverse if the erroneously admitted evidence was cumulative of other evidence appropriately admitted. *Payne v. State,* 854 N.E.2d 7, 13 (Ind.Ct.App.2006), *trans. denied.* Consequently, we decline Dr. Lin-

ton's invitation to reverse the trial court's decision.

### CONCLUSION

Based on the foregoing, we conclude that whereas the licensure status of a physician who gives an expert opinion is admissible to impeach the physician's opinion, the Board's specific findings are not admissible in judicial proceedings. However, here the trial court properly admitted the specific findings because Dr. Linton opened the door to the evidence. Furthermore, we find that the trial court. properly excluded the Panel's determination not to forward Dr. Linton's name to the Board. Lastly, we conclude that the trial court committed harmless error by refusing to admit Nurse Prcevski's testimony.

Affirmed.

KIRSCH, J., concurs.

SHARPNACK, SR., J., concurs in result.

experience, training or education." Ind. Evid. R. 702.